**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

**JUSTIN KEITH REYNOLDS,**

      **Plaintiff,**

**v.**                                     **Case No.: 6:13-cv-22604**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Plaintiff seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying his applications for child's insurance benefits ("CIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This action is assigned to the Honorable Thomas E. Johnston, United States District Judge, and has been referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are both parties' Motions for Judgment on the Pleadings as articulated in their respective briefs. (ECF Nos. 10, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

**I.    Procedural History**

On May 25, 2010, Plaintiff Justin K. Reynolds ("Claimant"), filed applications for SSI and CIB, alleging a disability onset date of April 5, 2004,[1] (Tr. at 146, 153), due to complications with type 1 diabetes mellitus, anger management issues, and learning disabilities. (Tr. at 184). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 69, 74, 82, 85). Claimant filed a request for an administrative hearing, (Tr. at 88), which was held on April 10, 2012 before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 39-64). By written decision dated May 18, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 19-32). The ALJ's decision became the final decision of the Commissioner on July 11, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed briefs in support of judgment on the pleadings, (ECF No. 10, 13), and Claimant subsequently filed a response to the Commissioner's memorandum. (ECF No. 14). Therefore, the issues are thoroughly briefed and ready

---

[1] As the Commissioner points out, "the relevant period for [Claimant's] CIB claim is from April 2008 through April 2012, the year when [Claimant] became age 22. In regards to SSI, [Claimant] cannot receive benefits in any month prior to his SSI application date. SSI is not retroactive. 20 C.F.R. § 416.335. Therefore, the relevant period of review for [Claimant's] SSI claim is from May 2010, the month of his SSI [application], to May 2012, the month of the ALJ's decision." (ECF No. 13 at 2).

for resolution.

## II.    **Claimant's Background**

Claimant was 20 years old at the time he filed the instant applications for benefits, and 22 years old on the date of the ALJ's decision. (Tr. at 33, 146). He is a high school graduate and communicates in English. (Tr. at 44).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking benefits due to disability has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the

4

impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth functional category (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). However, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2).

Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ must assess the claimant's mental residual functional capacity. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the special technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ determined as a preliminary matter that Claimant had not attained age 22 as of April 5, 2004, the alleged disability onset date.[2] (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. at 21-22, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "diabetes mellitus, generalized anxiety disorder, panic disorder with agoraphobia, dysthymic disorder, intermittent explosive disorder, and borderline intellectual functioning (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. at 22, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have any impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-25, Finding No. 4). Accordingly, he assessed Claimant's residual functional capacity. The ALJ found that Claimant was "illiterate based on testing in the record" and that

> He has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except he can never perform climbing of ladders, ropes or scaffolds; he can occasionally perform crawling. He must avoid concentrated exposure to extreme cold, extreme heat, and hazards such as heights and machinery. He is limited

[2] In order to qualify for CIB, the child of "an individual who dies a fully or currently insured individual" must establish (a) that at the time of filing his application the child was (i) under 18 years of age, (ii) under 19 years of age and a full time elementary or secondary school student, or (iii) under a disability as defined in 42 U.S.C. § 423(d) which began before the child reached age 22, 42 U.S.C. § 402(d)(1)(B); and (b) that the child was dependent upon the deceased individual at the time of that individual's death. 42 U.S.C. § 402(d)(1)(C)(ii); *see also* 20 C.F.R. § 404.350(a). Claimant's father, Edward Reynolds Jr., passed away on July 13, 2002, when Claimant was 12 years old. (Tr. at 146). Because Claimant filed his application for CIB at the age of 20, (*id.*), he must demonstrate that the onset of his disability occurred prior to reaching age 22. Given that Claimant alleges a disability onset date of April 5, 2004, the date of his fourteenth birthday, a finding of disability under the five-step sequential method would establish his eligibility for both CIB and SSI. *See Hicks v. Colvin*, No. Civil Action No. 7:12–cv–618, 2014 WL 670916, at *2 n.2 (W.D. Va. Feb. 20, 2014) (noting that "[a] claim for Child's Insurance Benefits is analyzed under the same five-step sequential process used to determine disability for purposes of disability insurance benefits and supplemental security income"); *Hartwell v. Colvin*, No. Civil No. 1:12–05447, 2014 WL 1225030, at *3 (S.D.W.Va. Mar. 24, 2014) (applying sequential evaluation method to a claimant's applications for CIB and SSI).

> to understanding, remembering, and carrying-out simple instructions, and to work without strict production quotas or a rapid pace. He would be limited to no interaction with the public, and only occasional interaction with co-workers and supervisors.

(Tr. at 25-31, Finding No. 5). At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 31, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 31-32, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1990, and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because his did not have any relevant work. (Tr. at 31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 31-32, Finding No. 10), including work as a laundry aid worker, a cleaner, and a racker of bakery products. (Tr. at 32). Therefore, the ALJ concluded that Claimant had not been under a disability from the onset date through the date of the decision, May 18, 2012, and was not entitled to the benefits he sought. (Tr. at 32, Finding No. 11).

**IV.**    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the ALJ's decision. First, Claimant insists that he meets and/or equals the requirements of listing 12.05C; accordingly, the ALJ erred at step three of the sequential process by finding him "not disabled." (ECF No. 10 at 12). Second, Claimant contends that he is "unable to perform the basic mental demands of unskilled work as described in SSR 85-15" and therefore qualifies as

disabled. (ECF No. 10 at 16). Third, Claimant asserts that the ALJ committed reversible error by failing "to consider the 'observations by [the SSA's] employees,' as required by 20 C.F.R. §§ 404.1529 and 416.929." (ECF No. 10 at 18).

In response, the Commissioner argues (1) that Claimant does not meet the requirements of listing 12.05C because he does not satisfy the capsule definition of the listing, (ECF No. 13 at 14-17); and (2) that Claimant's statements regarding his impairments and limitations are not fully credible, (ECF No. 13 at 17-18). For these reasons, the Commissioner urges the Court to affirm the ALJ's determination of nondisability. (ECF No. 13 at 11-13, 19-20).

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the court, including the records of Claimant's health care examinations, evaluations, and treatment, and summarizes the relevant medical information as follows:

### A. Treatment Records

On March 12, 2003, Claimant received emergency treatment after he was found to have a blood sugar reading of 499. (Tr. at 424). Claimant was diagnosed with new onset of diabetes mellitus. (Tr. at 426, 459, 460). He spent four days in Charleston Area Medical Center and was discharged on March 16, 2003 with instructions to follow up with his primary care provider and his endocrinologist, Dr. Zangeneh. (Tr. at 461). Claimant attended follow-up appointments on March 20, 2003 and May 19, 2003. (Tr. at 404, 533-35). On May 23, 2003, Kevin Lewis, RN, MSN, CS, PNP, CDE of West Virginia University's Robert C. Byrd Health Sciences Center indicated in a letter addressed to Dr. Zangeneh that Claimant's Type 1 diabetes was in "good control." (Tr. at 530). Periodic check-ups reflected that

Claimant's diabetes remained in good control from May 2003 through March 2004. (Tr. at 519-29).

On June 8, 2004, treatment notes indicated that Claimant was "going into 8th grade" and "not testing regularly." (Tr. at 517). Claimant was assessed with Type 1 diabetes under "suboptimal control." (Tr. at 518). On October 13, 2004, however, Claimant was observed as "doing well clinically" and his diabetes was "in good control." (Tr. at 512-13).

On May 25, 2005, Nurse Lewis reported that at Claimant's most recent check-up he "did not bring any blood sugars with him and did not have any recollection of how his blood sugars had been running." (Tr. at 502). Nurse Lewis noted that Claimant had experienced "significant deceleration of his linear growth" in the past year, "probably due to his poorly controlled diabetes, poor nutrition ... and his risk factors such as smoking cigarettes and marijuana." (*Id.*). Nurse Lewis indicated that Claimant "[n]eeds to improve glycemic control to optimize what minimal growth is left." (*Id.*).

On August 30, 2005, Nurse Lewis observed that although Claimant was "doing well and being more compliant," his blood sugar average was 42 with a number of blood sugars running into the 300-500 range and multiple days of no tests at all. (Tr. at 498). Claimant reported taking insulin on a regular basis but Mr. Lewis "ha[d] questions about [Claimant's] compliance and taking insulin as he is supposed to." (Tr. at 498).

Claimant's quarterly check-ups between April 2006 and February 2007 revealed a general trend of decreasing control over his diabetes. (Tr. at 482-96). Claimant's quarterly check-ups between November 2007 and August 2008 reflected

poorly controlled, or uncontrolled, diabetes throughout this time period. (Tr. at 470-73, 290-94, 303-04).

On November 12, 2009, Claimant presented to the Coplin Clinic to re-establish primary care for diabetes mellitus. (Tr. at 358). Claimant reported poor glycemic control over the past several years "partially due to poor access to medical care and cost of medications." He explained that he had not had any labwork in approximately one year, was out of insulin, and was not on any oral prescription medications. (Tr. at 358). Claimant's review of systems elicited no abnormal complaints, and his physical examination was also normal. (Tr. at 358). Claimant was assessed with "Diabetes I, Uncontrolled," and was counseled on exercise and nutrition, with instructions to follow-up within three weeks. (Tr. at 358-59).

On January 11, 2010, Claimant attended a follow-up appointment at the Coplin Clinic. (Tr. at 356). Claimant failed to bring blood sugar logs, but reported that his overall glycemic control and sense of well-being had improved. (*Id.*). He reported some mild hypoglycemic episodes following the use of sliding scale insulin, which prompted the nurse practitioner to adjust his scale. (Tr. at 356). Claimant's physical examination was unremarkable, and he was assessed with "Diabetes I, Uncontrolled," with instructions to avoid exercise at peak insulin times. (Tr. at 356).

On April 15, 2010, Claimant attended a follow-up appointment. (Tr. at 355). His physical examination was normal, and his diagnostic studies showed that his hemoglobin A1c level had improved to 9.5. (Tr. at 355). Claimant was assessed with "Type 1 diabetes, uncontrolled," and he was instructed to continue his current medications, monitor his diet a little more closely, and return in three to six months. (Tr. at 355).

On October 27, 2010, Claimant returned to the clinic with complaints of increased stress, stating that he was "about to lose it," fatigue, significant recent weight change, decreased ability to concentrate, depression, insomnia, anhedonia, and panic attacks occurring for the past 4-5 years. (Tr. at 350-53). Claimant's physical examination was unchanged, except that his mood was observed as dysthymic and apathetic while his affect was abnormally flat. (Tr. at 352). Claimant was assessed with Diabetes Mellitus Type I – Uncontrolled, Anxiety Disorder NOS, and Depression. (Tr. at 352).

On December 27, 2010 Claimant presented to the clinic for follow-up complaining of stress and leg pain. Claimant requested Alprazolam (Xanax), stating that his current prescription of Tramadol was making him sick. (Tr. at 381). Claimant's physical examination was positive for bilateral leg pain, which Claimant rated as an eight on a ten-point pain scale. (Tr. at 381-82). Claimant was assessed with Type 1 diabetes mellitus ("DM"), poorly controlled; chronic anxiety; chronic leg pain; and non-specific arthropathies. (Tr. at 382).

Claimant returned to the clinic on February 10, 2011. (Tr. at 384). He again sought a prescription for Xanax for sleep difficulty and reported that he had scheduled an appointment with a psychiatrist. Claimant stated that his blood sugars had been fluctuating, running as low as 60 in the mornings and as high as 400 in the evenings. (Tr. at 384-86). Claimant's physical examination was unremarkable, except for pain in both knees down to his ankles. (Tr. at 385). Claimant was assessed with Type 1b DM, sleep disorder, and chronic anxiety state. (Tr. at 385). He was encouraged to see his psychiatrist for the purpose of prescribing Xanax. (Tr. at 385).

On February 25, 2011, Claimant attended a follow-up appointment with

complaints of chest pain, sore throat, heart burn, and "anxiety with chest pain or discomfort." (Tr. at 387). Claimant's physical examination was essentially normal, except that his affect appeared anxious. (Tr. at 388). Claimant was assessed with atypical chest pain, although his EKG  was essentially unremarkable, Type 1 diabetes mellitus, and panic disorder without agoraphobia. (Tr. at 389).

On November 15, 2011, Claimant continued to complain of stress. (Tr. at 390). Claimant also reported that his blood sugar was running in the 200 range. (Tr. at 390). Claimant's buccal mucosa was noted to be dry, and his abdomen was "not soft" on palpation, but otherwise his physical examination was unremarkable. (Tr. at 391). Claimant was assessed with Type 1 diabetes mellitus and anxiety disorder NOS. (Tr. at 392).

On February 21, 2012, Claimant reported not feeling well and experiencing a recent five-pound weight gain. (Tr. at 398). Claimant described having "recent emotional stress and chronic emotional stress" regarding "everything." (Tr. at 399). His pupils were observed as unequal and his abdomen was described as "not soft" on palpation. Otherwise, his physical examination was normal. (Tr. at 400). Claimant was assessed with Type 1 diabetes mellitus. (Tr. at 401).

### B. Evaluations and Opinions

#### 1. Mental Profiles and Opinions

On December 7, 2001, certified school psychologist, Rachael K. Parde, M.A., Ed.S., conducted an evaluation of Claimant, who was eleven years old at the time, at the request of his father. (Tr. at 412-16). Claimant's father was concerned about Claimant's previous test results and his current placement at school, indicating that Claimant was "embarrassed about being in a special education classroom and that he

wants to spend time in a regular classroom." (Tr. at 412-13). Claimant's father "inquired as to if [Claimant] may be tested to determine if he may have a learning disability as opposed to a mental impairment." (Tr. at 413). The evaluation consisted of a review of records, observation, Weschler Intelligence Scale for Children, 3d Ed., an adaptive behavior evaluation scale, and a psychological evaluation. (*Id.*). Ms. Parde also asked Claimant's father and his primary classroom teacher to complete evaluation reports. In his report, Claimant's father described Claimant as well-behaved, stating that he generally remained close to home, stayed busy, and followed directions well. Claimant's teacher reported that Claimant had "difficulty with basic skills and comprehension in reading, with spelling and organizing sentences and ideas into paragraphs, and multiplication and division," and opined that "although [Claimant] is eager to please and high functioning within her self contained classroom," he should remain in special education classes. (*Id.*).

Ms. Parde documented that throughout testing, Claimant was cooperative and eager to please, and "also displayed excellent effort and concentration." (Tr. at 413). Claimant's Wechsler Intelligence Scale for Children resulted in verbal, performance, and full scale IQ scores of 55, 74, and 62, respectively, all of which corresponded with the "Mentally Impaired" range. (Tr. at 414). Ms. Parde noted a significant discrepancy between Claimant's verbal and performance scores, "suggesting that [his] perceptual-motor channel of learning may be better developed when compared to his verbal-auditory channel. Ms. Parde further stated that "[i]n any future testing, there is a ninety-five percent chance that Justin's Full Scale IQ will fall between 58 and 69." (Tr. at 414).

On the Adaptive Behavior Evaluation Scale completed by Claimant's teacher, Claimant's functioning was measured in ten adaptive skill areas, including communication skills, self care, home living, social, community use, self-direction, health and safety, functional academics, leisure, and work. (Tr. at 415). Scores ranged from 0 to 20 with a mean of 10. "A standard score between 7 and 13 indicates that the student demonstrates a performance within the same range as most of the students in the standardization sample." (*Id.*). Claimant scored in the average range in nine of the ten skill areas with the only exception being functional academics. In functional academics, Claimant scored a six. Claimant scored an Adaptive Behavior Quotient of 97, again suggesting that Claimant's overall adaptive ability fell within the average range. (Tr. at 415).

Ms. Parde concluded that Claimant "appears to be an individual with impaired intellectual functioning," although she recommended that the evaluation results be compared to the most recent measures of his achievement functions. Ms. Parde noted that "[t]o be eligible for identification as mentally impaired, a student must show general intellectual functioning that is approximately 70 to 75 or below on scales with a mean of 100 and a standard deviation of 15 and related limitations in two or more adaptive skills areas and age of onset is 18 or below." (Tr. at 416).

At twenty years of age, Claimant was evaluated by John J. Kampsnider, Ph.D., at the request of the West Virginia Disability Determination Section. (Tr. at 317-21). On July 22, 2010, Dr. Kampsnider completed an Adult Mental Profile of Claimant, consisting of a clinical interview, mental status exam, WAIS-III intelligence testing, and WRAT-3 achievement testing. At that time, Claimant's chief complaints consisted of heart and kidney problems due to diabetes, as well as nervousness. (Tr. at 318).

14

Regarding his mental health symptoms, Claimant described "having anxiety attacks for the past five years currently, at a frequency of three times per week," with attacks being "uncued and involve symptoms of tachycardia, constricted breathing, tremors of the hands, nausea, dizziness, and a desire to be away from people." (Tr. at 318). Claimant also related "difficulty with anger control," which results in daily anger outbursts over minor problems and which involves property damage but not assault on others. (*Id.*). Claimant indicated that his "angry outbursts occur both at home with his parents and with strangers in the community." (*Id.*). Claimant denied any mental health treatment other than "periodic psychoeducational evaluations relating to his placement in special education while in school." (Tr. at 318). Claimant stated that he repeated kindergarten and was placed in special education, remaining in that status until he graduated from high school. (*Id.*). When asked to list his present activities of daily living, Claimant described his day as consisting of preparing breakfast, taking his insulin shots, doing light chores such as dishes or making the bed, preparing lunch, walking or sitting outside, sporadically mowing the lawn, grooming and preparing for bed, and visiting his parents daily and his niece sporadically. (Tr. at 319).

Claimant's mental status examination was normal with respect to his appearance, psychomotor behavior, orientation, thought process, thought content, perception, persistence, and pace, and he denied any suicidal/homicidal ideations. (Tr. at 319). Claimant's interpersonal/attitude was cooperative though he "presented with a hesitant response pattern and with extremely limited elaboration." (Tr. at 319). Claimant's speech was soft, slow in cadence, and "impoverished for content." (Tr. at 319). His affect was constricted and mildly flat, but cognitively congruent, while his

15

mood was observed as anxious. (Tr. at 319). Claimant's abstract thought was "intact with an estimated level of IQ in the low range." (Tr. at 319). Claimant's insight was observed as moderately impaired based upon his persistent anxiety attacks without seeking treatment, while his judgment and concentration were both observed as moderately impaired based upon the subtest scores on the WAIS-III. (Tr. at 319). Claimant's immediate and recent memories were observed as markedly impaired and mildly impaired, respectively, based upon his time-lapsed ability to recall four words. (Tr. at 320). His remote memory was observed as moderately impaired based upon his frequent inability to recall personal historical data. (Tr. at 319-20). Claimant's social functioning was moderately impaired based upon clinical observations of his anxiousness during the interview. (Tr. at 320)

On the Wechsler Adult Intelligence Scale (WAIS-III), Claimant scored 71, 75, and 70 for verbal IQ, performance IQ, and full scale IQ, respectively. (Tr. at 320). Dr. Kampsnider found that the "results of the WAIS-III are valid in that the claimant put forth good effort under adequate testing conditions." (Tr. at 320). On the WRAT-3 achievement test, Claimant's scores reflected reading, spelling, and arithmetic skills corresponding with grade levels 3, 2, and 2 respectively. (Tr. at 320). Dr. Kampsnider found the results of Claimant's WRAT-3 testing to be valid for reasons similar to those noted in his WAIS-III intelligence testing. (Tr. at 321). Dr. Kampsnider diagnosed Claimant with "Panic Disorder with Agoraphobia" and "Intermittent Explosive Disorder" along Axis I, and "Borderline Intellectual Functioning" along Axis II. (Tr. at 321).

On September 21, 2010, Dr. Kampsnider provided a clarifying addendum explaining the basis for his diagnosis of Claimant's intellectual functioning. (Tr. at

16

322-23). He noted that Claimant had reported a history of special education throughout school, although Claimant was not clear on the type of placement. Subsequent to Claimant's evaluation, Dr. Kampsnider had received and reviewed Claimant's school records which "suggested that the claimant was placed in the mentally impaired classroom with a full scale IQ of 65." ((Tr. at 322). Dr. Kampsnider indicated that, contrary to the IQ documented in the school records, during Claimant's July 2010 evaluation, he obtained a full scale IQ of 70, which placed him "on the borderline between retarded and borderline intellectual functioning." (Tr. at 322). Dr. Kampsnider ultimately diagnosed Claimant with "borderline intellectual functioning" based upon the scatter among his subtest scores, three of which were in the "low average range." (Tr. at 323). According to Dr. Kampsnider, "[t]his presents a picture of near normal functioning in some areas suggesting that his true IQ is probably closer to the upper 70s or low 80s." (Tr. at 323). Additionally, Dr. Kampsnider noted that Claimant's "reports of his adaptive functioning do not suggest that he was functioning in the mild mental retarded range," that he was "currently semi-independent and can travel extended distances without supervision," as well as "provide assistance to his parents in terms of chores and meeting his own daily needs such as grooming and simple meals." (Tr. at 323). Consequently, Dr. Kampsnider opined that "the diagnosis of borderline intellectual functioning would be a *[sic]* more descriptive of his current level of cognitive functioning." (Tr. at 323).

On September 29, 2010, consultative psychologist Jeff Boggess, Ph.D. prepared a psychiatric review technique and mental RFC opinion of Claimant, based upon his school records and the evaluation by Dr. Kampsnider. (Tr. at 326-45). Dr. Boggess assessed Claimant with Borderline Intellectual Functioning, Panic Disorder,

and Intermittent Explosive Disorder. (Tr. at 333, 337, 339). Dr. Boggess opined that as a result of his mental impairments, Claimant had mild limitations in his activities of daily living; moderate difficulties maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 342). Accordingly, Dr. Boggess opined that the evidence did not establish that Claimant meets any of the relevant Listing criteria. (Tr. at 343). Dr. Boggess observed that Claimant had "no psych treatment or past record to support current diagnoses" but that his mental status exam noted "moderate limitations in concentration and social functioning" while his Adult Function Report indicated "allegations in the same areas posed as moderate on consultative evaluation." (Tr. at 344). Accordingly, Dr. Boggess stated that "Claimant appears mostly credible." (Tr. at 344).

Regarding Claimant's mental RFC, Dr. Boggess opined that Claimant was moderately limited in his abilities to understand, remember, and carry out detailed instructions, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting; but that he was not significantly limited in any other functions relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (Tr. at 326-27). Dr. Boggess noted Claimant's report regarding ADL's that he "doesn't do personal care, washes dishes, doesn't drive because of his sugar, can count change and handle savings, traps and hunts during the winter." (Tr. at 328). Accordingly, Dr. Boggess opined that Claimant "retain[ed] the ability for 1-2 step work activity with limited contact with the general public." (Tr. at 328).

On October 27, 2010, consultative psychologist G. David Allen, Ph.D. provided a case analysis in which he "reviewed all pertinent evidence in this file" and affirmed as written Dr. Boggess's September 29, 2010 opinion.[3] (Tr. at 346). On December 1, 2010, consultative psychologist Philip E. Comer, Ph.D. provided a case analysis in which he reviewed the evidence on file and affirmed as written Dr. Boggess's September 29, 2010 opinion. (Tr. at 361).

On October 18, 2011, consultative psychologists, Frank Bettoli, Ph.D. and Gary Stover, M.A. of Westbrook Health Services, Inc. completed a psychological evaluation of Claimant pursuant to a referral from the West Virginia Department of Health and Human Resources to assist in determining Claimant's eligibility for Medicaid. (Tr. at 365-70). Assessments included a clinical interview, mental status examination, Kaufman Brief Intelligence Test-second Edition (KBIT-2), Beck Anxiety Inventory (BAI), Beck Depression Inventory (BDI-II), and Personality Assessment Inventory (PAI), but Dr. Bettoli was not provided any records for review. (*Id.*). Claimant reported experiencing stress and anger problems, including anxiety attacks several times per week over the past three years. (Tr. at 365-66). Claimant also reported feeling suspicious of others, experiencing insomnia, poor appetite, and difficulty concentrating. (Tr. at 366).

Claimant's mental status examination was normal as to presentation, orientation, speech, thought processes and content, cooperation, psychomotor activity, immediate recall, and remote memory, with no evidence of hallucinations or delusional ideation. (Tr. at 367-68). Claimant's eye contact was "so-so as [he] was

---

[3] This case analysis referred to the assessment as having been completed on September 29, 2009. (Tr. at 346). However, there were no assessments completed in 2009, as Claimant did not file his applications for benefits until May 25, 2010. (Tr. at 146). The undersigned regards this date as a typographical error, as Dr. Boggess' opinion was completed on September 29, 2010. (Tr. at 328).

noted to look down frequently." (Tr. at 367-68). His affect was relatively restricted and somewhat flattened. (Tr. at 368). His recent recall and concentration were observed as diminished, while Mr. Stover observed that his "lacked persistence on test items and was noted to give up quickly on items he perceived as being difficult." (Tr. at 368).

On the KBIT-2 test, Claimant's verbal, nonverbal, and IC composite scores were 74, 55, and 60, respectively. (Tr. at 368). Dr. Bettoli noted that the scatter among Claimant's subtest scores suggested "that current scores are perhaps not reflective of capabilities" and hypothesized that "[f]actors such as concentration, anxiety, depression, and motivation may have negatively affected his performance." (Tr. at 368). Dr. Bettoli further noted that Claimant's "reported school performance and clinical impression based upon interview would suggest that the obtained scores are an underestimate of [Claimant's] cognitive abilities, which are thought to be more consistent with the Borderline to Low Average range of intelligence." (Tr. at 368).

Claimant's BAI and BDI-II scores both indicated severe symptoms of anxiety and depression, respectively. (Tr. at 368). Claimant's responses to the PAI "produced essentially valid results" although there were "suggestions that [Claimant] may have attempted to portray himself in a negative or pathological manner in particular areas." (Tr. at 368). Accordingly, Dr. Bettoli cautioned that "clinical scale evaluations may over represent the extent and degree of significant feelings in certain areas." (Tr. at 368). His personality profile results reflected "a person who is dysphoric and pessimistic combined with impulsivity and the potential for acting-out behaviors." (Tr. at 369). Claimant described a "personality style with numerous antisocial character features," which suggested that he was "likely to be unreliable and

20

irresponsible and would probably have difficulty sustaining success either socially or occupationally" and that he is likely to be egocentric and reckless with respect to potential dangers to himself and those around him. (Tr. at 369). Claimant also reported "a number of difficulties consistent with a significant depressive experience," as well as "a discomforting level of anxiety and tension" and the "indication of moodiness and emotional lability, with mood swings being fairly rapid and rather extreme." (Tr. at 369). Accordingly, "confusion, distractibility, and difficulty concentrating [were] likely to be present to some degree." (Tr. at 369).

Based upon Claimant's interview, mental status examination, and personality testing, Dr. Bettoli diagnosed Claimant with Generalized Anxiety Disorder and Dysthymic Disorder along Axis I; Borderline Intellectual Functioning, provisional and Antisocial Perosnality Traits along Axis II; Diabetes (Type I), possible heart and kidney problems along Axis III; and Psychosocial and Environmental Problems including occupational problems, financial problems, and health problems along Axis IV; and assigned Claimant a GAF score of 55. (Tr. at 369).

Dr. Bettoli concluded that Claimant's test results "reflected impaired intellectual functioning at present" but that Claimant's report of completing high school and observed ability to read and respond to clinical testing led Dr. Bettoli to believe that Claimant's "ability is probably at least in the borderline range." (Tr. at 370). Claimant exhibited symptoms of Generalized Anxiety Disorder as well as Dysthymia, although it did "not appear that symptoms have ever reached the level of a major depressive episode." (Tr. at 370). Although Claimant exhibited some antisocial traits, Dr. Bettoli declined to diagnose him with antisocial personality disorder, as available information was not definitive. (Tr. at 370). Finally, Dr. Bettoli

21

recommended psychiatric evaluation for possible pharmacological intervention. (*Id.*).

## 2. Physical Examinations and Opinions

On July 16, 2010, consultative physician Fulvio Franyutti, M.D. provided a Physical RFC Opinion regarding Claimant's functional limitations. (Tr. 308-15). Dr. Franyutti opined that Claimant was capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, could stand and/or walk with normal breaks for 6 hours in an 8 hour workday, could sit with normal breaks for 6 hours in an 8 hour workday, and was unlimited in his ability to push and/or pull. (Tr. at 309). Regarding postural limitations, Dr. Franyutti opined that Claimant could occasionally crawl and climb ladders, ropes, or scaffolds, and could frequently climb ramps and stairs, balance, stoop, kneel, and crouch. (Tr. at 310). Regarding environmental limitations, Dr. Franyutti recommended that Claimant avoid concentrated exposure to extreme cold, extreme heat, and hazards, but that he could withstand unlimited exposure to wetness, humidity, noise, vibration, and irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. at 312). Dr. Franyutti observed that Claimant's statement was only partially credible. (Tr. at 313). Dr. Franyutti also reviewed Claimant's function reports and pain questionnaires, finding that his report of activities of daily living were partially supported by findings and that his statements were partially credible. (Tr. at 313).

On October 27, 2010, consultative physician A. Rafael Gomez, M.D., provided a case analysis in which he reviewed all the evidence in the file and affirmed as written Dr. Franyutti's July 16, 2010 opinion. (Tr. at 348). On December 2, 2010, consultative physician Porfirio Pascasio, M.D., provided a case analysis in which he reviewed all the evidence in the file and also affirmed as written Dr. Franyutti's July

16, 2010 opinion. (Tr. at 363).

**VI.**  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

### A. *Listing 12.05C*

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the instant case, Claimant argues that the ALJ erred when he failed to find Claimant disabled under listing 12.05C. Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including listing 12.05 (Mental Retardation[4]). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

---

[4] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. Moreover, the structure of the listing, its diagnostic description, and its severity criteria are unchanged.

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* In other words, to qualify for disability under listing 12.05C, Claimant must establish that he has an intellectual impairment that satisfies both the *diagnostic description* of mental retardation and the *severity criteria* set forth in paragraph C. The diagnostic description of mental retardation, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" **and** "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

In this case, the ALJ found that Claimant failed to meet any of the three prongs of listing 12.05C. In regard to the first prong, the ALJ concluded that Claimant had the medically determinable, severe impairment of borderline intellectual functioning. (Tr. at 22). Borderline intellectual functioning is defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, ("DSM-IV")[5] as an IQ in the range of 71-84. In contrast, listing 12.05's diagnostic description of "significantly subaverage general intellectual functioning," is defined as an IQ of 70 or less,

---

[5] ©American Psychiatric Association. This edition was in effect at the time the ALJ's written decision was issued. The definition of borderline intellectual functioning is found at page 684. Of course, the diagnosis of borderline intellectual functioning versus mental retardation is largely a function of the severity criteria found in the second prong of the listing.

corresponding with the DSM-IV's diagnosis of mental retardation. *See Durden v. Astrue,* 586 F.Supp.2d 828, 833 (S.D.Tex. 2008). Furthermore, the ALJ concluded that Claimant "does not have any deficits in adaptive functioning." (Tr. at 25).

As for the next two prongs, set forth in the paragraph C criteria, the ALJ concluded that Claimant failed to produce evidence of "a valid verbal, performance, or full scale IQ of 60 through 70" and thus failed to meet the second prong of the listing. (Tr. at 24-25). Similarly, the ALJ determined that Claimant was unable to meet the third prong of the listing because his impairments of diabetes mellitus, generalized anxiety disorder, panic disorder with agoraphobia, dysthymic disorder, and intermittent explosive disorder did not result in a "significant work-related limitation of function that prevents him from maintaining substantial gainful activity given consideration of the residual functional capacity below." (Tr. at 25).

Claimant contends that the ALJ's analysis of the evidence under listing 12.05C was flawed in several ways. First, Claimant argues that the ALJ erred in finding that Claimant had borderline intelligence and did not have a valid verbal, performance, or full scale IQ of 60 through 70; particularly, in light of test scores submitted by Claimant that were in the 50 to 65 range. (ECF No. 10 at 12-14). Second, Claimant contends that the record demonstrates that he, in fact, did suffer "manifestations of deficits in adaptive functioning prior to age 22." (ECF No. 10 at 14-15). Finally, Claimant asserts that his additional severe impairments clearly impose significant work-related limitations. (ECF No. 10 at 15).

The undersigned agrees with Claimant that the ALJ erred in his analysis of whether Claimant met listing 12.05C with respect to two of the three prongs of the listing. First, the ALJ's statement that Claimant "does not have any deficits in

adaptive functioning," (Tr. at 25), is plainly erroneous in light of other findings in his written decision. Second, the ALJ applied an incorrect standard when he determined that Claimant did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. at 24-25).

To meet the diagnostic description of listing 12.05, Claimant had to display deficits in adaptive functioning with an onset before age 22. At the time of the administrative hearing, Claimant was a mere five days past his twenty-second birthday, and virtually all of the documentary evidence relied upon by the ALJ was prepared well before the administrative hearing. Accordingly, there is no doubt that any findings made by the ALJ regarding deficits in adaptive functioning would refer to deficits that "initially manifested during the developmental period."

Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV at 40. Skill areas of adaptive functioning include "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 39. Notably, the listing's diagnostic description "does not specify what degree of deficit is required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue,* 690 F.Supp.2d 464, 477 (W.D.Tex. 2010). However, because a claimant must also show deficits in adaptive functioning to qualify under "other alternative listings within the broader Mental Retardation Listing, i.e., Listings 12.05A, 12.05B, and 12.05D, 'the

27

deficits necessary to satisfy [Prong 1] would appear to be less than the [Prong 3] criteria of Listing 12.05D, which requires 'marked' restriction of activities of daily living and social functioning.'" *Nelson v. Astrue,* 1:09-cv-117, 2012 WL 373364 (M.D.N.C. Feb. 3, 2012) (quoting *Blancas,* 690 F.Supp.2d at 476). "Any other interpretation might reduce Prong 3 of Listing 12.05D to a nullity, something courts must avoid." *Id.* As a result, a finding of moderate deficits in adaptive functioning would arguably satisfy the diagnostic description. *Linaberg v. Com. of Social Sec.,* Case No. 1:13-cv-177, 2014 WL 3101449, at *n. 9 (N.D.W.Va. July 7, 2014)

After reviewing the record and the opinions of the medical sources, the ALJ concluded that Claimant had moderate restrictions in activities of daily living, moderate limitations in social functioning, and moderate difficulties in maintaining persistence, concentration, and pace. (Tr. at 23). These findings alone tend to negate the ALJ's unsupported statement that Claimant had ***no*** adaptive deficits. *See Nelson,* 2012 WL 373364, at *5; *Hager v. Astrue,* Case No. 2:09–cv–01357, 2011 WL 1299509, at *3 (S.D.W.Va. Mar. 31, 2011); *Linaberg,* 2014 WL 3101449, at *n. 9 ("A finding of at least moderate limitations of functioning has been held to be facially in tension with the ALJ's conclusion that a claimant lacks deficits in adaptive functioning"). In addition, Claimant clearly had deficits in functional academics from a young age, prompting his placement in special education classes. Deficiencies in functional academics have been long recognized as deficits in adaptive functioning with onset in the developmental period. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23. 2012) ("functional academic skill is the primary measure of deficits of adaptive functioning before age 22."). Furthermore, the ALJ specifically

28

noted that Claimant was illiterate despite having graduated from high school, a finding that is patently inconsistent with his statement that Claimant had no adaptive deficits. *See Turner v. Bowen,* 856 F.2d 695, 699 (4th Cir 1988).

The ALJ also erred in concluding that Claimant's other mental and physical impairments did not meet the third prong of listing 12.05C, because they did not *prevent Claimant from maintaining substantial gainful activity.* (Tr. at 25). As previously stated, the third prong of listing 12.05C requires "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05C. When the additional impairment imposes a functional limitation that significantly reduces the claimant's physical or mental ability to do basic work activities, it is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). "Basic work activities" include, for example, (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). If the additional impairment does not result in limitations that are "'severe" as defined in §§ 404.1520(c) and 416.920(c), the additional impairment does not impose "an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit') has not restricted the meaning of "significant work-related limitation" in 12.05C to the definition of "severe impairment" found at §§ 404.1520(c) and 416.920(c).

Instead the Fourth Circuit has explained the term in context of its peripheries. The Court has stated that a "significant limitation under section 12.05C need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985). That is, "something less than a preclusion from any substantial gainful employment must apply." *Id.* Thus, "if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § 12.05C" regardless of whether the impairment is found to be severe. *Flowers v. United States Dep't of Health & Human Servs.*, 904 F.2d 211, 214 (4th Cir. 1990); *see also Branham*, 775 F.2d at 1273-74. Additionally, the Fourth Circuit has held that "[a]n illness or injury imposes a significant limitation when its effect on the claimant's ability to work is more than slight or minimal." *Pullen v. Bowen*, 820 F.2d 105, 109 (4th Cir. 1987). The Court acknowledges that an additional severe impairment or combination of impairments will automatically establish the third prong of section 12.05C, as "the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities." *Luckey v. United States Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *14 (S.D.W.Va. Jun. 17, 2011). *Jackson v. Astrue,* 467 F. App'x 214, 217 (4th Cir. 2012) (finding that where ALJ found severe impairments at step two, along with other diagnosed conditions, claimant had satisfied the "impairment imposing an additional and significant work-related limitation of function" prong). Accordingly, Claimant's severe impairments of diabetes mellitus, generalized anxiety disorder, panic disorder with agoraphobia, dysthymic disorder, and intermittent explosive disorder meet the third prong of

listing 12.05C regardless of whether they, alone or in combination, "prevent" Claimant from maintaining substantial gainful activity.

Nonetheless, the ALJ's errors do not require that the Commissioner's decision be remanded. In order for Claimant to prevail at the third step of the sequential evaluation process, he must meet or equal all three prongs of listing 12.05C. Consequently, if substantial evidence exists to support the ALJ's finding with respect to even one of the prongs, the ALJ's determination that Claimant is "not disabled" at step three of the process must be affirmed. *Hancock v. Astrue,* 667 F.3d 470, 475 (4th Cir. 2012). Because substantial evidence supports the ALJ's finding that Claimant failed to meet the second prong of listing 12.05C, the undersigned **FINDS** that the ALJ did not err at this step of the process.

The second prong of listing 12.05C requires proof of subaverage general intellectual functioning through submission of "a valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05C. In the introduction to Section 12.00, the SSA explains that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00. However, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* Furthermore, when "considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities." *Id.*

The record in this case includes the results of three intelligence tests performed on Claimant. The first test was performed on December 7, 2001, when Claimant was eleven years old. Claimant was tested at his father's request by a school psychologist, Ms. Parde. Claimant completed a well-accepted, standardized test, the WISC-III, and received a verbal IQ of 55, a performance IQ of 74, and a full scale IQ of 62. (Tr. at 414). Ms. Parde noted a significant discrepancy between Claimant's verbal and performance scores, which she attributed to a better developed perceptual-motor channel of learning. Claimant's verbal subtests were consistently in the impaired range, while his performance subtests revealed scatter, showing some average and some impaired functioning. Ms. Parde opined that in future testing there was a 95% chance that Claimant's full scale IQ would fall between 58 and 69, within the mildly mentally retarded range. (Tr. at 414).

Claimant's second IQ test was completed on July 22, 2010, at the age of 20. Claimant was again administered a well-accepted, standardized test, the WAIS-III, and scored a verbal IQ of 71, a performance IQ of 75, and full scale IQ of 70. (Tr. at 320). These scores were considered valid by the examining psychologist, Dr. Kampsnider, "in that the claimant put forth good effort under adequate testing conditions." (Tr. at 320). Achievement testing reflected that Claimant read at a third grade level, spelled and did arithmetic at a second grade level. Dr. Kampsnider diagnosed Claimant with borderline intellectual functioning, later explaining, "The full scale IQ obtained at the time of the report was 70; however, this put him on the borderline between retarded and borderline intellectual functioning. I diagnosed him as borderline intellectual functioning due to (1) a scatter among the subtest scores ranging from 3 (arithmetic) to 9 (block design). Three subtests (7, 8, and 6) are in the

low average range. This presents a picture of near normal functioning in some areas suggesting that his true IQ is probably closer to the upper 70s or low 80s. Also, claimant's reports of his adaptive functioning do not suggest that he was functioning in the mild mental retarded range." (Tr. at 322-23).

On October 18, 2011, Claimant took the KBIT-2, a briefer, but well-recognized intelligence examination. Claimant's results included a verbal IQ of 74, a nonverbal IQ of 55, and an IQ composite of 60. (Tr. at 368). However, the examining psychologist, Dr. Bettoli, indicated that the scores were not valid, observing that the scatter among subtest scores "suggest[s] that current scores are perhaps not reflective of [Claimant's] capabilities" and "suggest that the obtained scores are an underestimate of [Claimant's] cognitive abilities, which are thought to be more consistent with the Borderline to Low Average range of intelligence." (Tr. at 368). Dr. Bettoli concluded that Claimant's effort was less than optimal and gave Claimant a provisional diagnosis of borderline intellectual functioning. (Tr. at 369-40).

In reconciling the evidence, the ALJ first addressed the school testing. (Tr. at 29). He pointed out that the testing was done at the request of Claimant's father, who believed that Claimant may have been improperly placed in special education classes at school, and may have had a learning disability rather than a mental impairment. The ALJ noted the father's report of Claimant's activities, including skateboarding, bike riding, mechanical work, and playing on the computer. Claimant's father also indicated that Claimant followed directions and behaved well. The ALJ observed that although the testing reflected Claimant to be mildly mentally impaired, the school psychologist "did not comment on the validity of the scores." (*Id.*). The ALJ also remarked that Claimant ultimately graduated from high school, with a class ranking

of 42 out 77 students, after spending only 23 percent of his time in special education classes. (Tr. at 29). He successfully completed an agricultural mechanics class and took a welding course as well.

The ALJ next discussed the findings and comments of Dr. Kampsnider and Dr. Bettoli. He commented that both psychologists opined that Claimant had at least borderline intellectual functioning, and both experts felt that the IQ scores Claimant obtained on their tests underestimated his level of intelligence and cognitive abilities. The ALJ emphasized Dr. Kampsnider's opinion that Claimant's scores on the subtests suggested an IQ in the upper 70's or low 80's. (Tr. at 30). This opinion was essentially shared by Dr. Bettoli. Additionally, Claimant's adaptive functioning was simply inconsistent with the diagnosis of mental retardation. (Tr. at 25). The ALJ spent considerable time reviewing Claimant's activities, explaining how they contradicted an IQ score of 70 or below. For example, the ALJ pointed out that Claimant traveled without supervision, prepared his own meals, managed his own grooming, lived alone next to his parents, had many friends, had a long-term girlfriend, worked on 4-wheelers, hunted, fished, managed a savings account, mowed the lawn, rode a bike, shopped, took medication independently, did household chores, and went to doctors' appointments. Even though Claimant could not read and write well, he could complete the Adult Function Report and was able to care for himself relatively independently. Based upon the record as a whole, the ALJ determined that none of the IQ scores below 71 was valid.

Claimant contends that the ALJ erred in discounting the 2001 WISC-II Verbal IQ of 55 and Full Scale IQ of 62. (ECF No. 10 at 12-14). He highlights Ms. Parde's statements that he "displayed excellent effort and concentration" throughout the

evaluation, and that "[i]n any future testing, there is a ninety-five percent chance that [Claimant's] Full Scale IQ will fall between 58 and 69," (Tr. at 413-14), to bolster his argument that "substantial evidence supports a finding that Plaintiff has a valid IQ score between 60 through 70 and meets and/or equals this requirement of Section 12.05C." (ECF No. 10 at 14). However, this argument is not persuasive for two reasons. First, Claimant too narrowly defines the term "valid" in the context of IQ testing. Validity means not only that the test measures what it is supposed to measure, and that the test taker is putting forth a legitimate effort. In addition, validity in the setting of intelligence testing means that the test results are "consistent with the developmental history and the degree of functional limitation." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00.  In the case of the 2001 test, while Ms. Parde implicitly confirmed that Claimant put forth a valid effort in completing the test, she did not attempt to reconcile the results with Claimant's developmental history or adaptive skills, other than to comment on the correlation between his scores and his academic deficit and opine that he might benefit from a specially designed instruction program. Ms. Parde never explained the discrepancy between Claimant's otherwise average adaptive abilities and his mentally impaired IQ scores; particularly, the verbal score of 55. To the contrary, Ms. Parde recommended that someone else make this comparison and take into account "all information (classroom performance, intellectual performance, achievement and adaptive abilities)."(Tr. at 416).

Second, Claimant's argument also fails for the simple reason that the relevant inquiry for this Court is not whether substantial evidence supports Claimant's position that the 2001 IQ scores are valid, but whether substantial evidence supports the ALJ's position that the scores are not valid. *See Blalock*, 483 F.2d at 775. In

general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, but the ALJ is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); *see also Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The ALJ may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions, or other evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ. *Clark*, 141 F.3d at 1255; *see also Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986). The question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Pogue v. Astrue,* 692 F. Supp.2d 1088 (E.D. Mo. 2010).

Viewing the record as a whole, substantial evidence supports the ALJ's decision to disregard the 2001 IQ test results. The test was administered when Claimant was only 11 years old. Both the social security regulations and the Commissioner's Program Operations Manual System ("POMS") recognize that IQ test results obtained from children younger than age 16 are not always consistent over time. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(10); POMS § DI 24515.055A. According to the regulations, "a child's IQ score tends to stabilize by the age of 16;

therefore IQ test results obtained before 16 are considered current for only two years when the IQ score is above 40." *Id.* Although "the application of this provision to the *adult* mental retardation description is unclear," *Hager,* 2011 WL 1299509, at * 3, at the very least, the age of the 2001 test would explain the ALJ's decision to give it less evidentiary weight than the subsequent test results and accompanying explanations provided by Drs. Kampsnider and Bettoli. Furthermore, as the ALJ emphasized, the IQ scores reported by Ms. Parde were inconsistent with Claimant's adaptive functioning as described by his father, and as independently rated by his classroom teacher. Claimant's father requested the intelligence testing primarily because his personal observations of Claimant's activities and behavior at home were inconsistent with the school's decision to place Claimant in special education classes. Claimant's teacher completed an Adaptive Behavior Evaluation Scale, containing 104 items that measured Claimant in ten adaptive skill areas, including communication, self care, home living, social, community use, self-direction, health and safety, functional academics, leisure, and work. (Tr. at 415). With the exception of functional academics, Claimant scored in the average range in all of the skill areas.

Moreover, the 2010 and 2011 IQ tests and opinions of the examining psychologists support the ALJ's conclusion that Claimant had borderline intellectual functioning, rather than mental retardation. Dr. Kampsnider explained that scatter among the subtest results were consistent with borderline to low average intelligence, and Claimant's level of functioning was near normal in many areas. Dr. Bettoli likewise opined that Claimant's IQ scores did not adequately reflect his level of cognitive functioning, and surmised that Claimant was not putting forth full effort. He estimated that Claimant had low average intelligence. Dr. Bettoli based his

opinions on his clinical observations of Claimant, as well as Claimant's scores on the subtests, and his ability to do tasks unrelated to his IQ test; such as read and complete a personality inventory. (Tr. at 369-70).

Accordingly, the undersigned finds substantial support on the record for the ALJ's determination that Claimant did not meet diagnostic criteria for disability under listing 12.05C and **RECOMMENDS** that the District Court **FIND** that the ALJ's determination is supported by substantial evidence.

### B. Remaining Challenges

Claimant also argues that (1) the evidence clearly demonstrates that Claimant is unable to complete the basic mental demands of competitive, remunerative, unskilled work, and (2) the ALJ failed to give adequate consideration to an observation in the record by a Field Office representative who described Claimant as "dazed," and "limited in his cognitive abilities," and found Claimant's limitations to be "extremely evidenced." (ECF No. 10 at 17-18). Neither of these challenges has merit.

In Claimant's first challenge, he identifies no particular failure on the part of the ALJ; rather, he invites the Court to examine and weigh the evidence, then make a disability determination. However, the Commissioner is charged with these tasks, not the Court. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*

In Claimant's second challenge, he argues not only that the ALJ should have considered the Field Office employee's observation, but that the ALJ should have expressly addressed it in his written decision, and the failure to do so was an error

requiring remand. Claimant is wrong. An ALJ has the duty to '"explicitly indicate[ ] the weight given to all of the relevant evidence,' *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir.1984), but need not discuss every shred of evidence included in the record." *Frasier v. Colvin,* No. 9:12–cv–01947–DCN, 2014 WL 526400 (D.S.C. Feb. 10, 2014). The discussion of the evidence supplied by the ALJ should be sufficient to accomplish two things; one, to assure the reviewing court that the important evidence was considered, and, two, to allow the court to understand the reasoning that supports the ALJ's decision. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985). Here, the ALJ provided a thorough discussion of the relevant evidence that fully explained the ALJ's reasoning for finding Claimant capable of working. The undersigned finds the explanation to be adequate even if it does not contain a comment about every piece of information in the record. In any event, an ALJ is never held to the standard of producing a perfect decision, and "[p]rocedural perfection in administrative proceedings is not required. [The] court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). *See, also, Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996). There is no reason to believe that remanding the Commissioner's decision to allow the ALJ to more fully consider or discuss the Field Office employee's observation might lead to a different result. The observation was

made based upon a single teleclaim interview. (Tr. at 181). The Field Office employee is not noted to be a physician, or identified as having any special qualifications or training. Furthermore, the observation of the employee is similar to other observations and findings in evidence and addressed by the ALJ in Claimant's RFC assessment.

Accordingly, the undersigned **FINDS** that the ALJ adequately considered the evidence of record and provided a sufficient explanation of the reasoning underlying his disability determination. The undersigned further **FINDS** that substantial evidence supports the Commissioner's decision that Claimant is not disabled under the provisions of the Social Security Act.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 13), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  August 19, 2014.

_____
Cheryl A. Eifert
United States Magistrate Judge